UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

QUANAPARKER HOWARD,

               Petitioner,                          **No. 03-CV-6059 (VEB)**
      -vs-                                    **DECISION AND ORDER**

MICHAEL McGINNIS, Superintendent,
Southport Correctional Facility,

               Respondent.
_____

## I.     Introduction

*Pro se* petitioner Quanaparker Howard ("Howard" or "petitioner") has filed a petition for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Erie County

Court, following a jury trial, on two counts first degree assault, one count of second degree

assault, one count of first degree unlawful imprisonment, and one count of endangering the

welfare of a child. The parties have consented to disposition of this matter by a magistrate judge

pursuant to 28 U.S.C. § 636(c)(1).

## II.    Factual Background and Procedural History

### A.    Overview

On August 11, 1998, Buffalo Police Officer Anthony Marshall, went to 313 Hempstead

in Buffalo, to investigate a report of child abuse that had been made to Child Protective Services.

T.185.[1] That apartment was rented by Tiffany McCann ("McCann"), who was petitioner's

girlfriend. T.204. Through the open doorway, the officer saw an emaciated child, Mikel

_____

[1]        Citations to "T.___" refer to pages of the trial transcript.

McCann, who appeared to be about three or four years old. T.183, 85. Officer Marshall entered the house and discovered, in an upstairs bedroom whose door had been taped shut from the outside, T.186 . Officer Marshall removed the tape and entered the room where he found a nine-year-old boy, Keith McCann. The room was essentially empty save for a bed without any sheets on it and a red plastic baseball bat lying on the bed. T.192. Keith was naked and tied up in the closet with electrical cord, with his hands outstretched in a "crucifix" position: One arm was tied to the bedframe, and the bedframe was secured to the radiator with coaxial cable and speaker wire; and his other arm was tied to the metal clothes-pole in the closet with electrical cord. T.187. Keith's hands were covered with socks, and electrical cord was wrapped around his wrists over the socks. His legs were tightly tied together with electrical cord wrapped all the way from his knees up to his waist. *Id.* There was a pillowcase over his head, secured by a sock around his neck. *Id.* He appeared to have been "whipped and beaten"– his body was covered with marks and cuts, from his head to his feet; some of the wounds were old and some were fresh. The officer observed that Keith appeared to "have a split across his penis," which was reddened, swollen and raw. T.196, 199, 301-05.

At first, Officer Marshall did not think the boy was alive because he was not moving. T.188. When he and removed the pillowcase from the boy's head, the officer saw that there was electrical duct tape wrapped all the way around Keith's face from his nose down to his chin. T.188-89. Underneath the tape, a sock had been wadded and stuffed into the child's mouth and was soaked with saliva. T.189, 191. The officer untied Keith and brought him over to the bed where he untied the cord and peeled off the electrical tape. When Officer Marshall asked the boy who did this to him, Keith said that "his mom." T.195.

Keith was taken to the emergency room at Children's Hospital where he was treated for his injuries. At the hospital, Keith also stated, "Quan (i.e., petitioner) beat me with a red plastic baseball bat."

McCann was arrested that night when she arrived home from work a short time after the police arrived. Petitioner was arrested on two days later as he was driving his vehicle by McCann's apartment. T.205. He waived his rights and gave a statement to the police admitting his knowledge of, and participation in, the abuse of McCann's son. Following at the pre-trial suppression hearing, the statement was held to be voluntary and admissible. Prior to his joint trial with McCann, Howard's statement was redacted to remove references to McCann. In the part that was read into the record, petitioner admitted to hitting Keith on several occasions.

### B.      The Trial

#### 1.      The Prosecution's Case

At trial, Keith testified to an escalating pattern of abuse at the hands of his mother and then subsequently by both his mother and petitioner, whom he called "Quan." *See* T.100 *et seq.* In the summer of 1997, McCann "started whooping [him]" with an extension cord and a belt when she would learn that he had misbehaved at school or he "would bring home a bad report" or would eat food that was off-limits to him. T.102, 131, 141. Keith stated that petitioner did hit him, but "in the first beginning [sic] Quan wouldn't whoop [him]." T.102-03. Sometimes he would be wearing clothes but other times his mother beat him while he was naked. *Id.*

Eventually, in the summer of 1998, his mother started tying him up in the basement, her bedroom, or his bedroom, using a telephone cord or a speaker cord. T.103. He would be naked and McCann would bind his hands and feet and then "whoop" him with "[t]he bat" on his legs

-3-

and his back. T.104, 106. Keith testified that Quan also hit him with the baseball bat and when he was tied up in the basement, petitioner "had whoop [sic] [him] with the extension cord," as well. T.105; *see also* T.143-44. He was not given anything to eat, and when he had to go to the bathroom he "had to go on [him]self." T.106-07. Keith stated that with regard to this first incident, he was tied up "[a] long time"–he "was standing up overnight" and "in the morning [petitioner] untied the ropes" and Keith went back to his room. T.147-48.

Keith also described the incident that culminated in the police discovering him on August 11, 1998. ("I was tied up again, but I wasn't – I wasn't going to get loose until five days, but that's when the police came, found me. . . . It was only two [nights] because that night the police found me."). Again, he was naked, deprived of food, and told to urinate on himself. At first, Keith was bound in his mother's bedroom in the same manner as he had been in the basement, with electrical cords and cables. T.107. On direct, his testimony was that his mother tied him up, and he thought that petitioner participated in tying his wrists together. T.150, 151. He estimated that he was tied up in his mother's room for "[a] while," that is, "more than a day[.]" T.109. McCann hit him with an extension cord and "[t]hat plastic bat." She also threw a plastic hairbrush at his head "'cause [he] was moving around" and his arms "came down." T.111, 161. McCann told him "[t]o put them back up." T.111. After the brush hit his head, it "hit the wall real hard and it cracked," and his mother was not happy about it. T.110.

After a while, his mother moved him out of her room in the afternoon because she had to go to work, and tied him up again in his bedroom. T.112-15, 154-55. He was still naked. His mother then "stuffed" a sock "all the way down [his] mouth." T.116. "Quan had came [sic] home" and "bought some . . . black tape" which he put "around [Keith's] mouth." T.116, 157-58.

-4-

McCann then pulled a pillowcase over the boy's head. T.117. Keith testified that he knew that "Quan had hit [him]" and his mother had hit him, "but when the pillow case was over [his] head [he] wasn't sure" who was hitting him. T.118. His mother and petitioner beat him with the bat and the extension cord "[a] lot" both before and after the pillowcase was put on his head; he was "not sure how many" times." T.118. He would twist to try to get away from the blows which landed all over his body–to his back, his legs, his arms, and his stomach. T.119. Keith pointed out a scar on his wrist from being tied up, and scars on his left upper arm from being hit with the extension cord by his mother and petitioner. T.120-21, 123-25. He also testified that he has scars on his legs from where he was whipped with the extension cord. T.127.

When Keith arrived at the hospital, the examining doctor found "a lot of soft tissue injuries," as well as a swollen lip and a swollen right hand; crush marks on both wrists, resulting from a constriction or strangulation of the wrist; numerous cuts on his chest, back, and buttocks; a swollen penis with some blood at the end of it; and air under the skin on the right chest and shoulder. T.401-05. The x-ray showed a 10% collapsed lung (pneumothorax), and the CAT scan showed injuries to his internal organs: his liver had a lot of fluid in it (periportal edema), which is usually caused by a blunt injury. T.403. The duodenum, which connects the stomach to the small intestine, was bruised (hematoma), again suggestive of a blunt injury. *Id.* His liver function blood tests were indicative of injury; he had blood in his urine, again suggestive of blunt force injury to the kidneys. T.404, 407. The levels of CPC enzyme in his muscles was very high; usually it is about 200 and Keith's was 12,000. This indicates "lots of injuries to the muscles" by "[b]lunt forces or crushing forces." T.404. The internal injuries occurred within the past two to four days; most of the lacerations and bruises on his body were recent as well. T.405. Keith

weighed only 53 pounds, which put him in the 10th percentile on children's growth charts. T.409.

On cross-examination, the doctor conceded that when the child arrived at the emergency room, none of his injuries appeared to be life-threatening. T.444-45. The doctor testified that had Keith been left unattended and not permitted to have food or water "for a continued amount of time, his dehydration would have gotten worse," and eventually he would have died from dehydration. T.410, 415. The issue of the dehydration was "probably the most pertinent," in the doctor's opinion, because that can lead to hypobulimic shock, loss of consciousness, and, ultimately, death. T.414-15. Had Keith's wrists remained constricted, the consistent compressing force would have stopped arterial blood supply into the hand; eventually, the doctor testified, the hand "would die." T.406. Given the depth of the cuts and lacerations on his bodies, the doctor expected the scarring from them to be "probably permanent." T.411. According to Dr. Caty, all of the internal injuries sustained by the victim were ones from which he would recover. T.413. The doctor opined that as long as the pneumothorax (collapsed lung) did not collapse further, child "probably would have been okay . . . ." T.411. However, the doctor had never seen a pneumothorax occur spontaneously in a child. T.464.

The type of force necessary to inflict the lung and duodenal injuries suffered by the victim would be such things as a high-speed car accident or falling from a height of over two stories, for instance. T.462. The doctor opined that the injuries could have been caused by striking the child with a solid object, such as the red plastic baseball bat, if it were swung hard enough.

Several of McCann's neighbors at 313 Hempstead testified to overhearing her and petitioner abusing Keith. Judy Garrison, who lived at 315 Hempstead, next door to McCann,

testified that Howard used to stay overnight with McCann at the apartment. T.360, 381. At about 2 a.m. on the morning of August 11th, Garrison "heard a child screaming," She put her ear to the common wall between the apartments and realized that it was coming from McCann's apartment. The child said, "[P]lease, mommy, don't tie me up." T.362. She then heard McCann laugh. T.362, 372 Garrison "heard a hit" and then "heard him scream again." T.362. The boy "hollered" for "[a]bout fifteen or twenty minutes." T.372. After Garrison slammed the closet door to alert McCann that she had heard her, McCann "started running water 'cause I couldn't quite hear what her [sic] and Quan was [sic] saying after that." T.362-63, 377. Garrison knew Howard was there because she had seen his car parked outside before she went to bed and heard him when he came in. T.363. She also heard his voice through the wall; this was after she heard Keith begging not to be tied up. T.363, 368. She could not hear what petitioner was saying, however. That afternoon, Garrison called Child Protective Services to report her suspicions that Keith was being abused. T.364, 366.

Toni Foxworth, another one of McCann's neighbors at 313 Hempstead, testified that petitioner lived there with McCann and her two sons. T.468-69. Like Garrison, Foxworth's apartment shared a wall with McCann's. The night before the police came, she was woken up by "Keith crying, screaming . . . please don't tie me up again mommy, please don't tie me up again," to which McCann responded by laughing. T.470. Foxworth did not do anything at the time, and went back to sleep. T.470. The next day, Foxworth called child protective services. T.473-74.

Twenty-four-year-old Tiffany McCann, the victim's mother, testified that she came from a sexually and physically abusive background and was placed in foster care where, at age 14, she

had Keith as a result of being molested by her mother's boyfriend. Initially, Keith was living with McCann's mother, but McCann obtained custody of him in June or July 1997 after a court battle. She admitted to disciplining the boy with belts, at first, and then with extension cord. She "started off by whooping him with a belt" with his pants down in late 1997 or early 1998 for being suspended from school; she claimed that petitioner also would spank him with a belt. She admitted that, on August 10, 1998, Keith was tied up for hitting her younger son, Mikel's, head against a wall. T.582. McCann blamed petitioner for tying up Keith on the first occasion, claiming that she did not observe petitioner do it but instead found the child tied to a rail in the basement when she came home from work. T.580-82, 604. Later, on cross-examination, McCann claimed that when she came home on August 10, 1998, she found Keith tied up in her bedroom. She did not untie him immediately.

McCann admitted that she tied up Keith "once" and "whooped" him; this was on August 11, 1998, at about 2:30 p.m., before she left for work that day. She claimed that she did this because, at about 7:30 a.m. that morning, she had caught Keith touching his younger brother in a sexual manner. T.583. She was "very shocked" and then "went into the room and grabbed the first thing [she] saw and that was the extension cord" and then she went back into the room and "whooped" Keith, who already had his clothes off, about four or five times "[o]nly on his butt." T.583-84, 604, 639. She later admitted that she went down to the basement to get the multiple lengths of cable wire, cable cords, speaker wire, telephone cord, and shoelaces depicted in the photographs of the bedroom where Keith was found. She admitted that she used all of them to tie her son up to the bed, the closet pole, and radiator in the manner in which the police found him. T.620-24, 641. She claimed that she tied Keith up before she went to work because she "was

afraid of Mikel getting hurt by" him. T.643, 655.

She also alluded to another incident in which she claimed that Keith had been tied up by petitioner in the basement, purportedly because he had been feeding Mikel food scraps out of the garbage can. T.604. She claimed that this occurred while she was upstairs in the house and she did not go downstairs to the basement since she had already disciplined Keith for this incident by beating him with an extension cord. T.605.

On cross-examination, McCann viewed photographs of her son taken at the time he was taken to the hospital. Although she "whooped" her son with an extension cord, she denied causing any of the wounds depicted in the photographs and claimed that all of the boy's lacerations and scars were caused by petitioner. T.618-19, 640, 659. McCann testified that she never used the plastic bat against Keith but that she observed petitioner "tap" the child on the upper chest with the plastic bat. However, she described the blow as "not forceful." T.581, 617. T.581, 617. McCann claimed that she never wanted to hurt her son but was just attempting to discipline him, stating that she herself had been "whooped" as a child. T.632.

Officer Torre, who participated in interrogating petitioner, read into the record the following portion of the written statement petitioner gave on the night of his arrest:

> Q:  Did you ever hit Keith?
> A:  The first time I whooped [sic] Keith it was over sneaking food. It was about two weeks ago. I took him in the basement and made him pull his pants down and hit him about five times with my hand. The second time was about four days later. It was in his room and I whooped him with a belt on his bare butt. And just the other day it was in the basement. He was naked. I hit him with an extension cord less than ten times. Later that same day he was naked and I hit him with a red plastic bat on the shoulders about three times.

T.209. Officer Torre conceded that, during the interrogation, petitioner never admitted to tying

up the boy. T.219.

### 2. The Defense Case

Petitioner did not testify. His defense counsel sought to call a number of witnesses to present character evidence that petitioner had a reputation for non-violence. First, the defense called Lenora Love, petitioner's aunt, with whom he had stayed for several years after his mother passed away. T.702. Love was permitted to testify that petitioner got along well with her four children, and that she permitted him to babysit them. T.702-03. When defense counsel asked Love whether Howard had "any propensity for violence," the trial court sustained the prosecutor's objection.

The defense also called Michael Ferrentino, the assistant principal from the school that petitioner had attended for two years when he was in seventh and eighth grade. T.724. When asked about petitioner's reputation for violence when he attended the school, the trial court sustained the prosecutor's objection. T.726, 727. At the time of the alleged abuse, Keith also was attending the same school. Ferrentino recalled that petitioner accompanied Keith to two conferences at the school in 1998 when Keith was having discipline problems, e.g., fighting. T.723-24, 727-28. The assistant principal testified that Keith did not appear frightened of petitioner and did not appear malnourished; he looked to Ferrentino like a normal, nine-year-old boy. T.736.

The woman who ran the daycare that Keith and Mikel attended testified that the boys always seemed to be hungry; while they were at her house, they would gorge themselves, go vomit in the bathroom, and then eat more as if they could not get enough to eat. T.741. The daycare provider testified that "when Quan picked them up they was [sic] happy to be with him."

T.742. When asked if they appeared frightened of their mother, she stated, "I don't know. I just knew they was quiet, just real quiet," when McCann picked them up.T.742.

Petitioner also called Marquita Strong and Steven Durolek, two supervisors from Quality Markets, where Howard had worked for two years as a cashier beginning in March 1997. Strong was not permitted to give any testimony about Howard's reputation because the trial court sustained all of the prosecution's objections to form. *See* T.807 *et seq.* When Durolek testified, he was asked, and testified, that petitioner's reputation in the store community with respect to honesty and violence was "[g]ood, very good" and that was "why he was promoted to office clerk because he was trusted." T.844. Durolek testified that Howard was "a perfect gentleman." T.844.

Avery Vaughan, an ex-boyfriend of McCann's, testified under subpoena for petitioner. T.775. Vaughan recalled that when he first moved in with McCann, only Mikel was living there; Keith moved in sometime in August 1997. T.777. Vaughan argued with McCann about how she "went to the extreme in disciplining Keith, sometimes Mikel," T.780. First she used a belt and then she started using extension cords. T.778, 780, 781. Vaughan admitted that McCann wanted him to do the same things she was doing to her children–to whoop them with a belt or ironing cord. However, he stated that he never hit them. T.781. Vaughan recalled Keith used to get punished for eating certain foods without getting permission; he would get a "whooping" with a belt or extension cord. T.782. Vaughan testified that he moved out after about two months; they had a "big pushing and shoving match," part of which was about the discipline issue. T.780, 785-87.

### B.     The Verdict, Sentencing, and Post-Conviction Proceedings

The jury returned a verdict convicting both petitioner and McCann on all five counts submitted to it. Petitioner was sentenced to concurrent terms of imprisonment, the longest of which were the sentences of 12 ½ to 25 years on the two convictions for first degree assault. His co-defendant received the same sentences. These sentences were the maximum permissible under New York's Penal Law.

Represented by new counsel, Howard appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. The conviction was unanimously affirmed. *People v. Howard*, 294 A.D.2d 874 (App. Div. 4th Dept.), *rearg. denied*, 747 N.Y.S.2d 851 (App. Div. 4th Dept.), *leave to appeal denied*, 98 N.Y.2d (N.Y. 2002),

In the instant habeas petition, Howard raises four grounds for relief, the first three of which involve various evidentiary issues and the sufficiency of the evidence supporting the convictions. All of these were raised on direct appeal and respondent concedes that these claims have been fully exhausted for purposes of habeas review. As to the fourth claim, which asserts an Eighth Amendment violation (i.e., that petitioner's sentence is grossly disproportionate to the crime), respondent claims that it is unexhausted because petitioner failed to assert his sentencing claim in constitutional terms on direct appeal. Respondent argues that, in any event, none of Howard's claims has merit.

For the reasons that follow, the Court finds that habeas relief is not warranted and that the petition should be dismissed.

## III.    Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523 (2000); *accord Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir. 2003); *Clark v. Stinson*, 214 F.3d 315, 320 (2d Cir. 2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *accord Sevencan v. Herbert*, 342 F.3d 69, 73-74 (2d Cir. 2002), *cert. denied*, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. *Williams*, 529 U.S. at 413. The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." *See id. at* 408-10; *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir.2003); *see also Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir.2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be

said to be unreasonable.").

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), *cert. denied sub nom. Parsad v. Fischer*, 540 U.S. 1091, 124 S.Ct. 962 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041 (2003).

## IV.  Analysis of the Petition

### A.  Ground One:  The exclusion of testimony concerning petitioner's reputation for non-violence

As the first ground for habeas relief, *see* Petition, ¶21(A) (Docket No. 1), Howard that the trial court "excluded proof of petitioner's favorable reputation within his place of employment, child's school and family," depriving him of his constitutional rights to due process and to present a defense. On direct appeal, the Appellate Division adjudicated the claim on the merits, holding that although the trial "court erred in limiting defendant's introduction of evidence with respect to defendant's reputation for peacefulness (*see generally People v. Bouton*, 50 N.Y.2d 130, 138-140, 428 N.Y.S.2d 218, 405 N.E.2d 699 [(N.Y. 1980)]), that error [was] harmless (*see People v. Crimmins*, 36 N.Y.2d 230, 241-242, 367 N.Y.S.2d 213, 326 N.E.2d 787 [(N.Y. 1975)])." *People v. Howard*, 294 A.D.2d 874, 874 (App. Div. 4th Dept. 2002).

The Supreme Court has made clear that "habeas corpus relief does not lie for errors of

state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citations omitted). Thus, a petitioner

seeking habeas relief based upon an error of state evidentiary law must also allege that the state

evidentiary error violated an identifiable federal constitutional right, "which necessarily

eliminates consideration of purely state evidentiary errors not cognizable in the federal system."

*King v. Greiner*, No. 02Civ.5810(DLC)(AJP), 2008 WL 4410109, at *38 (S.D.N.Y. Sept. 26,

2008) (citations and footnote omitted). "The first step in this analysis is to determine whether the

state court decision violated a state evidentiary rule, because the proper application of a

presumptively constitutional state evidentiary rule could not be unconstitutional." *Id.* (citing

*Brooks v. Artuz*, 97 Civ. 3300, 2000 WL 1532918 at *6, 9 (S.D.N.Y. Oct. 17, 2000) (petitioner

did not demonstrate an error under state evidentiary law, "much less" an error of constitutional

magnitude); *Jones v. Stinson*, 94 F. Supp.2d at 391-92 (once the habeas court has found that the

state court ruling was not erroneous under state law, there is no need to apply a constitutional

analysis).

It is well established as a matter of both state and federal law that "in a criminal

prosecution, the accused may introduce evidence as to his own good character to show that it is

unlikely that he committed the particular offense charged[.]" *People v. Aharonowicz*, 71 N.Y.2d

678, 681 (N.Y. 1988) (citing, *inter alia*, *People v. Bouton*, 50 N.Y.2d at 135; *Edgington v.

United States*, 164 U.S. 361, 363-64, 366-367 (1896); *see also United States v. Han*, 230 F.3d

560, 564 (2d Cir. 2000) (citing Fed. R. Evid. 404(a)(1); *United States v. Pujana-Mena*, 949 F.2d

24, 29-30 (2d Cir.1991)). "It is equally well settled that such evidence is not 'in and of itself' or

'standing alone' sufficient to constitute a reasonable doubt as to guilt[.]" *People v. Aharonowicz*,

71 N.Y.2d at 682 (citing, *inter alia*, *People v. Trimarchi*, 231 N.Y. 263, 266)); *Pujana-Mena*,

949 F.2d at 29-30. Stated another way, "the jury may not ignore the People's evidence tending to establish guilt and, having considered only defendant's evidence of good character, render an acquittal based solely thereon," but "[r]ather . . . must consider character evidence in light of all of the evidence in the case." *Aharonowicz*, 71 N.Y.2d at 682.  Generally, character and reputation may not be proved by reference to specific acts, except to impeach the credibility of character witnesses. *People v. Miller*, 39 N.Y.2d 543, 551 (N.Y.  1976).

Here, on appeal, the state court found that it was error for the trial judge to preclude petitioner's "introduction of evidence with respect to defendant's reputation for peacefulness," *People v. Howard*, 294 A.D.2d at 274 (citing *People v. Bouton*,  50 N.Y.2d at 138-39). However, after reviewing the trial transcript in its entirety, it appears to this Court that when the trial court sustained the prosecutor's objections as to form, there was a proper basis in the law. I note that in *People v. Bouton*, the New York Court of Appeals reaffirmed that "it is error to exclude proof of an accused's favorable reputation within such parochial realms as a school," 50 N.Y.2d at 139 (citations omitted), since "[a] reputation may grow wherever an individual's associations are of such quantity and quality as to permit him to be personally observed by a sufficient number of individuals to give reasonable reassurances of reliability[.]" *Id.* (citation omitted). One of the limitations on this type of character evidence, however, is that the reputation must "be specific to the *particular* community." *Id.* at 138 (emphasis supplied).

Here, Marquita Strong was one of Howard's supervisors at the grocery store where he worked. She properly could be called to testify as to Howard's reputation within the limited community of the grocery store. However, the trial court repeatedly sustained the prosecutor's objections to the form of the questions. For instance, the defense asked about Howard's

"reputation or character in the community . . . for being violent towards employees[.]" T.807, 808; *see also* T.809-10. It appears that the trial judge sustained the objections because defense counsel did not specifically refer to the "limited community of the grocery store" in her questions. I note that when the defense later called Steven Durolek, another manager from the grocery store, defense counsel tailored the questions to petitioner's "reputation within the limited community" of the store with regard to violence and honesty. In that situation, the trial court overruled the prosecutor's objections and Durolek was permitted to answer as to both Howard's reputation for honest and non-violence. Under a hypertechnical reading of *People v. Bouton*, the trial court had a basis for sustaining the objections as to form when defense counsel did not clearly delimit the community in which the witness knew petitioner. *See People v. Bouton*, 50 N.Y.2d at 139-40. However, there was at least one iteration of defense counsel's questioning of Strong which was in proper form, and the trial judge should have permitted her to answer.

With regard to the same witness, Marquita Strong, the court also properly sustained the objections to defense counsel's questioning of her about Howard's "reputation towards children" and whether she had "witnessed Mr. Howard interact with children." T.808. In New York state courts, "[t]he proper method of proving character is by testimony of defendant's reputation in the community for the particular trait relating to and controverting the crime charged, such as honesty, veracity, peacefulness, or a law-abiding nature[.]" *People v. Berge*, 103 A.D.2d 1041, 1041, 478 N.Y.S.2d 433, 434 (App. Div. 4th Dept. 1984) (citing *People v. Van Gaasbeck*, 189 N.Y. 408). Furthermore, the evidence "must demonstrate a reputation rather than merely 'individual and independent dealings[.]'" *Bouton*, 50 N.Y.2d at 140 (quotation omitted). Thus, under New York evidentiary law, these questions were not in a proper form.

In addition, I do not agree that the trial court erred in sustaining objections to defense counsel's questioning of Michael Ferrentino, the assistant principal at the school where petitioner attended junior high. The prosecutor had a valid basis for arguing that any evidence that Ferrentino could supply regarding petitioner's reputation for violence was too remote, *see* T.556; more ten years had passed since the time that the assistant principal knew petitioner as a student at the school and the time of the alleged abuse and the trial. *See, e.g., People v. Van Gaasbeck*, 189 N.Y. 408, 419 (N.Y. 1907) ("[T]he time when such reputation existed must not be too remote . . . ."); *accord, e.g., People v. Colantone*, 243 N.Y. 134, 137 (N.Y. 1926); : 31 A.D.3d 962, 966, 818 N.Y.S.2d 674, 679) (App. Div. 3d Dept. 2006) ("There is no indication that the two character witnesses that defendant wished to produce had any knowledge of his reputation from before or near the time when the crimes were committed.") (citing, *inter alia*, Prince, Richardson on Evidence § 4-403, at 165 (Farrell 11th ed.) ("Evidence of the defendant's reputation . . . is admissible if not too remote.")). As the prosecutor argued, whether or not petitioner had a reputation for peacefulness or violence when he was eleven or twelve-years old was not especially probative or indicative of his reputation at the time the crimes were committed.

Finally, with regard to Lenora Love, the petitioner's aunt, defense counsel's attempt to elicit her knowledge of Howard's reputation for peacefulness was improperly phrased as inquiring into Howard's "propensity for violence." It does not appear from the transcript that defense counsel re-asked the question in a proper form. In any event, I note that Love was permitted to testify that petitioner got along well with her four children and was a trusted babysitter for them.

Even if this Court were to agree that the trial court erroneously excluded this character or reputation evidence, it agrees with the state court that any error was harmless."[W]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir.1996) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *accord Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000). As the Second Circuit has explained, "[i]n a close case, 'additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.'" *Jones*, 229 F.3d at 120 (quoting *Agurs*, 427 U.S. at 112 and citing *Hoke*, 90 F.3d at 47 (same)). On habeas review, trial errors are subject to the harmless error review standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (requiring "substantial and injurious effect or influence in determining the jury's verdict") (internal quotation marks omitted). *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2328 (2007). "The creation of otherwise non-existent reasonable doubt satisfies the 'substantial and injurious' standard." *Jones v. Stinson*, 229 F.3d at 120 (citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) ("*Agurs* . . . opted for its formulation of materiality . . . only after expressly noting that this standard would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under *Kotteakos* [*v. United States*, 328 U.S. 750 (1946), the standard adopted by *Brecht* ].").

Here, the Appellate Division concluded, without analysis, that the trial judge's refusal to admit the character evidence was "harmless", citing to *People v. Crimmins*. In *Crimmins*, the New York Court of Appeals specifically adopted the harmless error standard enunciated by the Supreme Court for cases on direct review that involve constitutional violations. *See*, *e.g.*,

*Chapman v. California. Crimmins*, 36 N.Y.2d at 241-42 (citing *Chapman v. California*, 386 U.S. 18) (holding, on direct review of criminal conviction, that court must find "that there is no reasonable possibility that the constitutional error might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt"). It is well established that the *Chapman* harmless error standard is more generous to defendants than the *Brecht* standard.[2] The Supreme Court has instructed that the proper inquiry in post-AEDPA habeas cases (regardless of whether the state court has decided the harmless error issue) is to measure the harmfulness of the error against the *Brecht* "substantial and injurious effect" standard. The "principal factors" to be considered are the "importance of . . . the testimony, and the overall strength of the prosecution's case." *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) (citing *Brecht v. Abrahamson*, 507 U.S. at 639). "[T]he strength of the prosecution's case 'is probably the single most critical factor in determining whether error was harmless,'" *Id.* (quoting *Latine v. Mann*, 25 F.3d 1162, 1167-68 (2d Cir.1994) (internal quotation marks omitted in original), cert. denied, 514 U.S. 1006 (1995)). Here, some of the character evidence was cumulative. For instance, Durolek was permitted to testify about petitioner's reputation within the community of the store where he worked. Other evidence was introduced in petitioner's behalf that, in this Court's opinion, was more probative of petitioner's non-guilt–such as the evidence given by the daycare provider that he had positive interactions with Mikel and Keith, and the evidence by the assistant principal that petitioner attended two conferences with Keith. Although some of the reputation evidence would not have been cumulative, its inclusion would not have created a reasonable doubt of petitioner's guilt in this case. Petitioner admitted to police that he hit Keith

---

[2]     Thus, logically, if a reviewing court concludes that an error is harmless under *Chapman v. California*, it is *a fortiori* harmless under *Brecht v. Abrahamson*.

with an extension cord while the boy was in the basement and he was naked, although petitioner

claims that he only struck the boy "less than ten" times with the cord and with the bat "about

three times." And, he points out, he never admitted to actually tying him up. However, to the

extent that he argues that he is not liable for the whipping, beating, and bondage performed by

his co-defendant on the victim ignores that he also was indicted as an accessory. I note that the

evidence was overwhelming that on the dates referred to (i.e., when Keith was punished in the

basement and in the bedroom on the day he was found), he was tied up. Thus, petitioner

obviously was aware of the sadistic manner in which the boy was bound and gagged. There is

substantial and compelling evidence that, at the very least, petitioner aided and abetted his

girlfriend in committing the crimes charged. That the boy received brutal and prolonged beatings

was proven by the extent of the injuries sustained; this proof, although circumstantial, was

overwhelming.

**B.**     **Ground Two: Erroneous preclusion of the victim's medical records containing statements by victim that his mother had caused his injuries, and testimony by the nurse who prepared the records**

Petitioner contends that it was improper for the trial judge to prohibit the defense from

introducing the victim's prior statements contained in the hospital records which implicated

McCann but allegedly exculpated petitioner . *See* Petitioner's Appellate Brief ("Pet'r App. Br.")

at 10 (citing T.63 ("pt. states mom has done this in the past. Father [sic] aware of abuse (hanging

[victim] in the closet), has released him from closet at one time prior."); T.72 ("pt. found . . . tied

up in "'crucifixed position', upright against door with sock stuffed in mouth, duct tape around

head. (rt.) and (lt.) hands were tied up and both hands swollen pt. reported that mom did that to

him. . . ."). Petitioner also was precluded from having the nurse who prepared one of the medical

records in question testify about the victim's statement to her that petitioner had released him from being tied up at one time in the past. *See id.* The Appellate Division, on direct appeal, held that the trial court "properly precluded defendant from introducing evidence concerning entries in the hospital record of the victim that were not germane to his treatment or diagnosis[.]" *People v. Howard*, 294 A.D.2d at 875 (citing *Musaid v. Mercy Hosp. Of Buffalo*, 249 A.D.2d 958, 989, 672 N.Y.S.2d 573 (App. Div. 4th Dept. 1988)).

"As an initial matter, it is well established that the mere fact that a state court made evidentiary errors, without more, does not provide a basis for habeas relief." *Crispino v. Allerd*, 378 F. Supp.2d 393, 409 (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Evidentiary rulings erroneously made by a state trial court amount to constitutional error only if such rulings have the effect of depriving the defendant of a fundamentally fair trial. *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973); *accord Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988) ("It is true that erroneous evidentiary rulings do not automatically rise to the level of constitutional error. The court's duty on a petition for habeas corpus is to determine whether the excluded testimony was material to the presentation of the defense so as to deprive the defendant of fundamental fairness. The court must determine whether the exclusion was an error of constitutional dimension, and whether that constitutional error was harmless . . . .").

It is well-established in New York that entries in hospital records and office records of treating physicians that are germane to the patient's diagnosis and treatment are admissible under the business records exception to the hearsay rule set forth in New York Civil Practice Law & Rules 4518, while those entries that are relevant neither to treatment nor to diagnosis are

inadmissible. *E.g.*, *Musaid*, 249 A.D.2d at 989; *Wilson v. Bodian*, 130 A.D.2d 221 (App. Div. 2d Dept. 1987)). The portions of the medical records, and the nurse's testimony, that petitioner sought to introduce dealt solely with who had allegedly inflicted the injuries for which the victim was being treated. However, the identity of the victim's abuser had no bearing on his diagnosis and the ensuing course of medical treatment to be provided to the victim by the nurse or the other health care workers. Thus, petitioner failed to meet the requirement that the evidence in the medical records be "germane" to the victim's diagnosis and treatment. Howard has not demonstrated that there was an error of New York state evidentiary rules, much less an error of federal constitutional magnitude. Accordingly, Ground Two does not provide a basis for habeas relief.

### C.    Ground Three: Other evidentiary errors

In Ground Three, Petition ¶21(C) (Docket No. 1), Howard contends the trial court's exclusion of various items of expert and lay witness testimony and medical records violated his constitutional right to present a defense pursuant to the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. Specifically, Howard asserts that the trial court erred in (1) precluding expert witness testimony as to the suggestibility of the child complainant; (2) denying the defense request for the child complainant's mental health records; (3) precluding the defense from calling social worker Mary Clavell to contradict testimony given by petitioner's co-defendant McCann as to whether McCann had a telephone conversation with the victim (her son) after charges were handed down against her and petitioner; (4) precluding testimony from social worker Ellen Gehring regarding alleged declarations against penal interest made by petitioner during the family court proceeding. On

direct appeal, the Appellate Division held that the trial court "properly precluded" all of these items of evidence.

A state trial court's "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983) (observing that a writ of habeas based upon an erroneous evidentiary ruling requires petitioner show that the error deprived him of a "fundamentally fair" trial). Here, Howard cannot not demonstrate that the evidentiary rulings at issue were incorrect as a matter of New York state law or federal law.

### 1. Preclusion of expert witness testimony regarding suggestibility of child victim

The Appellate Division held the trial court "properly precluded . . . expert testimony with respect to the victim's veracity and suggestibility[.]" *People v. Howard*, 294 A.D.2d at 874 (citing *People v. Johnston*, 273 A.D.2d 514, 517-18 (App. Div. 3d Dept. 2000) (internal quotations and citations omitted). In affirming the trial court's decision, the appellate court relied, without explanation, upon *People v. Johnson*. In *Johnson*, the defendant claimed error in the trial court's preclusion of his expert witness, a psychologist who was prepared to offer evidence concerning children's susceptibility to suggestive interrogation. The Third Department in *People v. Johnson* held that "[s]uch determinations of the admissibility and scope of expert testimony are committed to the sound discretion of the trial court, and the court's decision will not be disturbed absent a showing of serious mistake, error of law or abuse of discretion[.]" *Johnson*, 273 A.D.2d at 517. While "[e]xpert opinion is admissible if it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror[,]" it may nevertheless "be precluded if it is within the

average juror's understanding, not beyond the range of ordinary knowledge or intelligence and does not require professional or scientific knowledge . . . ." *Id.*

In Howard's case, the trial court gave its ruling on the record, stating simply that it was denying the defense motion to call a psychologist concerning the suggestibility of the child complainant. T.549-50, 711. The sparseness of the record makes it difficult for this Court to determine the basis on which the judge refused to admit the proposed expert testimony. For the purposes of deciding this habeas claim, the Court thus will consider whether the exclusion of the expert testimony violated Howard's right to call witnesses in order to present a meaningful defense at a criminal trial. *See Washington v. Schriver*, 255 F.3d 45, 60 (2d Cir. 2001) (noting that the *Taylor-Chambers* line of cases regarding the fundamental right of an accused to present a defense "has been applied to the exclusion of expert witnesses.") (citing *Agard v. Portuondo*, 117 F.3d at 705; *Ronson v. Commissioner of Correction*, 604 F.2d 176, 178-79 (2d Cir.1979) (*per curiam*). However, like all evidence, the admissibility of "expert testimony is limited by the requirements of relevancy and by the trial court's traditional discretion to prevent prejudicial or confusing testimony." *Agard*, 117 F.3d at 704; *see also United States v. Onumonu*, 967 F.2d 782, 786 (2d Cir.1992)."

In *Washington v. Schriver*, the Second Circuit extensively discussed the benefits expert testimony regarding the suggestibility of children would afford a defendant charged with a sexual crime against a child. 255 F.3d at 57. The panel noted that an "emerging consensus in the case law relies upon scientific studies to conclude that suggestibility and improper interviewing techniques are serious issues with child witnesses." *Id.* (citations omitted). However, given the specific facts and circumstances of the case before it, the *Washington* court held the exclusion of

the expert testimony on suggestibility did "not rise to the level of constitutional error because, in the context of this case, the admission of the testimony would not have created an 'otherwise non-existent' reasonable doubt about the petitioner's guilt." *Washington*, 255 F.3d at 60 (quoting *Jones*, 229 F.3d at 120; citing *Agard v. Portuondo*, 117 F.3d at 705 (same)).

In finding that the error in excluding the expert did not rise to the level of constitutional error, the Second Circuit in *Washington* relied principally on the number of other "ways in which suggestibility was presented to the jury," *id.* at 61, such as defense counsel's summation, the fact that the victim had made inconsistent statements, and the fact that her mother had taught her the word "rape,", 255 F.3d at 60-61. Here, as was the case in *Washington*, even though the jury did not hear expert testimony "relating to the potential suggestibility of the young witness," the "issues . . . were presented to the jury in several different ways." *Washington*, 255 F.3d at 60. First, Howard's counsel "gave a vigorous summation which clearly and forcefully discussed the theory," *id.*, that the prosecutor "used suggestive and leading questioning," *id.*, in questioning the child. Petitioner's counsel pointed specifically to different instances in which the prosecutor asked leading questions and had to "prompt Keith to mention [her] client [i.e., Howard]." T.875-76. Counsel pointed out that when the police officer untied Keith and asked him "who tied you up, he didn't say my client." T.872. Defense counsel exploited this fact on summation, arguing that the authorities rushed to judgment and did not properly investigate the case against petitioner. Counsel questioned why the child protective services worked who had called the police did not testify, asking why the prosecutor did not want the jury to hear what he told the other nurses and doctors "who first attended to him? They're mandated child abuse reporters. Did he say anything about my client?" T.972. Defense counsel pointed out the inconsistencies in

Keith's testimony, in particular with regard to several conflicting answers he gave about whether petitioner had actually been involved in abusing him. T.871, 874-75. And, the potentially suggestive influence of the prosecutor was presented by Keith's testimony that the assistant district attorney gave him a "book" of his grand jury testimony and told him to "study it as many times as I need to get it into my brain," T.871, 874, 877 ("You have to ask how is Keith's memory when the adults did not give him the script . . . ."). Moreover, as discussed above in this Decision and Order, the prosecution presented ample evidence implicating Howard in the abuse. Even if the expert had been permitted to testify, this was not such a "close case,"255 F.3d at 45, that the expert testimony "might [have] be[en] sufficient to create a reasonable doubt," *id.*

## 2. Exclusion of the child complainant's mental health records

On direct appeal, petitioner's appellate counsel argued that the trial court erred in denying the defense's joint request for the victim's mental health records to show that he was suggestible and to develop evidence of his behavioral problems at the time of the incidents, i.e., his alleged molestation of his younger brother, as claimed by his mother, petitioner's co-defendant. See T.481-84 (oral argument; trial court's denial based on "late nature" of request and because it was "up to the jury to decide, give weight to any testimony given by [the victim], whether or not it's consistent or irreconcilable, whether or not the assistant [district attorney] gave [him] the grand jury minutes to study them, that's all a matter for the jury to decide and weigh in assessing the credibility of [the victim]."); 710-11 (summarily denying petitioner's renewed motion for the mental health records).

The Appellate Division summarily agreed that the trial court "properly precluded defendant from introducing . . . the mental health records of the victim . . . ." *People v. Howard,*

294 A.D.2d at 874 (citing *People v. Washington*, 221 A.D.2d 391, 392 (App. Div. 2d Dept.

1995) (holding that the trial court properly sustained the People's objection medical records

concerning a psychiatric evaluation of the People's main witness on the grounds of relevancy; the

witness's alcoholism was not in dispute and that the psychiatrist's testimony and the medical

records would force the jury to engage in gross speculation as to whether or not the witness

suffered from this condition on the day of the incident)).  In light of New York state's law on this

issue, *e.g.*, *People v. Washington*, 221 A.D.2d at 392, I cannot find that the state courts'

exclusion of the victim's mental health records was erroneous as a matter of New York state

evidentiary law. *See*, *e.g., id.* As was the case in *People v. Washington*, the prosecutor at

Howard's trial argued in opposition to the defendants' joint request for the mental health records

that "[a]ny psychiatric examination of the child was done after this [alleged abuse] and a result

of this occurring, not prior to, not during." T.482. Therefore, the prosecutor argued, they were

not relevant to the instant criminal proceeding, and the need to preserve the child victim's

confidentiality outweighed the need for their disclosure. *Id.*; *see People v. Washington*.  Because

the state courts did not err as a matter of state evidentiary law in denying petitioner access to the

victim's mental health records, this claim does not provide a basis for habeas relief. *See Taylor v.

Curry*, 708 F.2d at 891.

### 3.    Exclusion of collateral testimony to impeach petitioner's co-defendant

Petitioner's trial counsel sought to call Mary Clavell, a social worker who had contact

with the victim at some point following the arrests and prior to trial. The asserted purpose was to

impeach the credibility of co-defendant McCann. McCann testified she had not spoken to the

victim since her arrest. The victim testified that he had spoken to his mother while in the

presence of "Miss Mary." Therefore, the defense argued, testimony from Clavell that McCann had spoken with her son after her arrest would impeach her credibility. T.745-46. The prosecutor objected, arguing that it was irrelevant and collateral, and the trial court agreed. On direct appeal, the Appellate Division held that Clavell's testimony was properly precluded, citing *Badr v. Hogan*, 75 N.Y.2d 629, 634-35 (N.Y. 1990) (holding that the trial court committed reversible error in permitting defense counsel to cross-examine plaintiff in contravention of the rule barring the use of extrinsic evidence to contradict a witness's answers on collateral matters--here, her denial that she had received public welfare funds to which she was not entitled--for the sole purpose of impeaching the witness's credibility) (citing *People v. Schwartzman*, 24 N.Y.2d 241, 245-46 (holding that cross-examiner cannot contradict witness' answers concerning collateral matters by producing extrinsic evidence for sole purpose of impeaching credibility, but where evidence sought to be introduced is relevant to some issue in case other than credibility, or if evidence is independently admissible to impeach witness, it may be admitted) (citing Richardson, Evidence § 491 (Prince 10th ed.)).

I cannot find that the state courts violated any evidentiary rule under New York state law. Nor was the ruling erroneous as a matter of federal law. *See United States v. LaChance*, 788 F.2d 856, 877 (2d Cir. 1986) (citing Federal Rule of Evidence 608(b), under which specific instances of conduct of a witness, for the purpose of attacking credibility, may not be proved by extrinsic evidence; noting that Rule 608(b) is, of course, designed to avoid jury distraction and confusion through the trial of collateral matters on the excuse of an impeachment purpose). Accordingly, habeas relief shall not issue on this claim.

> **4.      Exclusion of a social worker regarding declarations against penal interest made by petitioner**

Defense counsel sought to call as a witness another social worker, Ellen Gehring, to "bring out that [petitioner] ha[d] made an admission against penal interests . . . namely, that he . . . did discipline the child" in order "to have the jury know that he does admit to certain things, takes responsibility for that." T.750. Apparently, Gehring had testified in the family court proceeding that petitioner admitting "disciplin[ing] the child with his hands and a belt." T.750. Recognizing that petitioner was attempting to bolster his credibility and avoid testifying, the trial court then summarily denied the request. T.751. On direct appeal, in upholding petitioner's conviction, the Appellate Division did not specifically address this evidentiary issue.

This Court does not see what purpose would be served by having Gehring testify. The proffered testimony was the same, in sum and substance, as that contained in petitioner's inculpatory statement to the police in which he admitted to hitting Keith with his hands and a belt. Even if the evidence technically was admissible as an admission against penal interest, it does not necessarily follow that the trial court abused its discretion in precluding it. Gehring's testimony was cumulative because, in the portions of his statement read to the jury, petitioner admitted to the police to striking the victim with his hands and a belt. "[W]ide discretion is bestowed upon the trial court to exclude or include evidence," *Morrison v. Johnson*, No. 1:01-CV-636 (RFT), 2007 WL 433353, *2 (N.D.N.Y. Feb. 2, 2007)) (citing, *inter alia*, *Blissett v. Lefevre*, 924 F.2d 434, 439 (2d Cir.1991); *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 230 (1940) (finding a matter to be collateral and that the trial court has a "wide range of discretion in the exclusion of such evidence")). The trial court's preclusion of Gehring from providing cumulative testimony was not erroneous as a matter of state or federal law. *E.g.*, *Bergamaschi v. Gargano*, 293 A.D.2d 695, 696, 742 N.Y.S.2d 322, 323 (App. Div. 2d Dept.

2002) ("As a general rule, the issue of whether evidence should be excluded as cumulative rests within the sound discretion of the trial court[.]") (citations omitted)); *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir.1983) (exclusion of relevant but cumulative evidence is within the discretion of the trial court). Habeas relief accordingly is not warranted.

### D. Ground Four: Failure of the prosecution to present legally sufficient evidence to support the convictions

On direct appeal, Howard asserted that the trial court erroneously denied his motions to dismiss on the basis of insufficient evidence. The Appellate Division rejected these claims on the merits, holding that

> The evidence of serious physical injury is legally sufficient to support defendant's conviction of assault in the first degree ([N.Y.] Penal Law § 120.10(1), (3)) and assault in the second degree ([N.Y. Penal Law] § 120.05(8); *see People v. McCann*, 292 A.D.2d 804, 738 N.Y.S.2d 642). . . . Contrary to the further contention of defendant, he may be held liable for intentionally aiding the codefendant to engage in conduct constituting the offense of assault in the first degree under the first count of the indictment (*see* [N.Y.] Penal Law § 120.10(3), *supra*) where, as here, the proof establishes that defendant acted "with the mental culpability required for the commission" of that offense, i.e., recklessness ([N.Y. Penal Law] § 20.00; *see People v. Flayhart*, 72 N.Y.2d 737, 741).

*People v. Howard*, 294 A.D.2d at 875. Howard raises these same contentions in support of habeas review, except for the procedurally defaulted claim regarding the merger issue.

### 1. Insufficiency of proof of "serious physical injury" to sustain the convictions of first degree assault under depraved indifference theory, first degree assault by means of a deadly instrument, and second degree assault on a person less than eleven-years-old

A habeas petitioner challenging the legal insufficiency of the evidence supporting his conviction is only entitled to relief if it is found upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, that no rational trier of fact could have

found proof of guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also People v. Contes*. A habeas "[p]etitioner bears a 'very heavy burden' in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir.1993) (internal quotation marks omitted in original)).

As a first step, "[w]hen considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" *Ponnapula*, 297 F.3d at 179 (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir.1999)). Howard challenges the sufficiency of the prosecution's proof regarding the "serious physical injury" elements of the first degree assault convictions under N.Y. Penal Law §§ 120.10(1) and (3), and the second degree assault conviction under N.Y. Penal Law § 120.05(8). New York's Penal Law defines "serious physical injury" as "physical injury which creates a substantial risk of death, *or* which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. PENAL LAW § 10.00(10); *compare with* N.Y. PENAL LAW § 10.00(9) (defining "physical injury" to mean "impairment of physical condition or substantial pain")).

Here, the victim was whipped repeatedly all over his naked body with electrical extension cords and bound his arms and legs tightly, for long periods of time, with phone cable and speaker wire. The prosecutor, in describing the photographs of the victim taken at the time of the incident, noted that there were "hundreds" of marks all over his body. *See* T.909; People's Exhibit 22 & 23. When he evaluated and treated the child for his injuries at the hospital, the prosecution's medical doctor testified that he expected the scarring from the cuts and lacerations

to be permanent, given the depth of the wounds. *See* T.410-11. Indeed, at the time of trial, the boy still had visible scars; in particular, he had scars on legs and arms from the whippings with the electrical cord, and scars on his wrist from being tied up with electrical cable suspended with his arms above his head in a "crucifix" position for hours at a time.

In light of this, it cannot be said that the jury acted irrationally in concluding that the prosecutor had submitted sufficient evidence to prove, beyond a reasonable doubt, that the victim's injuries, caused by petitioner and McCann, caused "serious and protracted disfigurement" and therefore constituted "serious physical injury" as defined by New York Penal Law § 10.00(9). Accordingly, habeas relief is denied on this claim. *See Vasquez v. Graham*, No. 07 Civ. 7575(DLC), 2008 WL 4500702, at *4 (S.D.N.Y. Oct. 7, 2008) (denying habeas relief where evidence sufficient to prove "serious physical injury" element of first degree assault; "[t]he scarring and disfigurement of Rodriguez's face from her burn injuries was still visible at the time of the trial (some nine months after the incident), and Dr. Yurt stated that scarring and disfigurement that remained after a year is not likely to change"; "evidence demonstrate[d]that Rodriguez's injuries constituted "serious and protracted disfigurement," and therefore "serious physical injury" under New York law.") (citing *People v. McDuffie*, 740 N.Y.S.2d 48, 49 (App. Div. 1st Dept. 2002) (upholding conviction for first degree assault where "the jury observed the victim's permanent scars and could have reasonably concluded that they constituted protracted disfigurement"); *People v. Wade*, 590 N.Y.S.2d 245, 246 (App. Div. 2d Dept. 1992) (finding evidence sufficient to support first degree assault where victim had been cut in face with razor and where scar was visible eight months after incident)); *see also People v. Brendan C.*, 216 A.D.2d 918 (App. Div. 4th Dept. 1995); *People v. Pittman*, 253 A.D.2d 694 (App. Div. 1st Dept.

1998).

## 2. Insufficiency of the proof of accessorial liability

Howard argues that he should not be held liable under New York's liability accessory statute, N.Y. Penal Law § 20.00,[3] based upon his co-defendant's actions to the extent that she *recklessly* exposed the victim to a grave risk of death, causing serious physical injury. The Appellate Division held that Howard "may be held liable for intentionally aiding the codefendant [his girlfriend, McCann] to engage in conduct constituting the offense of assault in the first degree under the first count of the indictment (*see* [N.Y.] Penal Law § 120.10(3) . . .)[4] where, as here, the proof establishes that defendant acted "with the mental culpability required for the commission" of that offense, i.e., recklessness ([N.Y. Penal Law] § 20.00; *see People v. Flayhart*, 72 N.Y.2d 737, 741 . . . )." *People v. Howard*, 294 A.D.2d at 875. This particular claim, although raised under the point heading in petitioner's appellate brief challenging the sufficiency of the evidence, is really about an alleged inconsistency in the verdicts. To the extent such a claim presents a federal constitutional claim cognizable on habeas review, it is without merit.

As explained by the New York Court of Appeals, "[New York] Penal Law § 20.00 imposes accessorial liability on an accomplice not for aiding or encouraging another to reach a particular mental state, but rather for intentionally aiding another to engage in *conduct* which

---

[3]    "When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." N.Y. PENAL LAW § 20.00.

[4]    First degree assault under a "depraved indifference" theory occurs when, "[u]nder circumstances evincing a depraved indifference to human life, [the defendant] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person . . . ." N.Y. PENAL LAW § 120.10(3).

constitutes the charged offense while himself 'acting with the mental culpability required for the commission' of that offense." *People v. Flayhart*, 72 N.Y.2d 737, 741 (N.Y. 1988) (emphasis in original); *see also People v. Kaplan*, 76 N.Y.2d 140, 144 (N.Y. 1990) ("[N.Y.] Penal Law § 20.00 provides that a person may by held criminally liable as an accomplice when he performs certain acts and does so 'with the mental culpability required for the commission' of the substantive crime."). In *People v. Flayhart*, the New York Court of Appeals rejected defendants' contention that their convictions could not be sustained because it was "logically impossible to 'aid and abet' criminally negligent homicide, an unintentional crime." *Flayhart*, 72 N.Y.2d at 741. Specifically, the defendants in *Flayhart* contended that a person "cannot 'intentionally aid' another to 'fail to perceive a substantial and unjustifiable risk' of death, the requisite mental state for criminally negligent homicide[.]" *Id.* (citation omitted).  The defendants in *Flayhart,* a husband and wife caring for the husband's severely disabled brother, were convicted because the jury found that each of them, while "fail[ing] to perceive a substantial and unjustifiable risk" of death, intentionally aided the other to engage in certain conduct, such as failure to provide food and medical care, which ultimately brought about [the victim's] death[.]" *Id.* (citations omitted). Thus, *Flayhart* held, "the defendants could be guilty as accomplices to the crime of criminally negligent homicide under Penal Law § 125.10, even though neither defendant had the victim's death as a 'conscious object'[.]" *Id.* (citing N.Y. Penal Law § 15.05(1)).

The New York Court of Appeals has "construed [N.Y. Penal Law §] 20.00 as not requiring specific intent within the meaning of Penal Law § 15.05(1) when the substantive crime [to which the accessorial liability attaches] does not involve such intent[.]" *People v Kaplan*, 76 N.Y.2d 140, 145 (N.Y. 1990) (citations omitted). The court in *Kaplan* explained *Flayhart*'s

holding as "flow[ing] naturally from the fact that both defendants could be found to have 'fail[ed]' to perceive a substantial and unjustifiable risk' of death–the 'mental culpability required for the crime' (Penal Law § 20.00 ("acting with the mental culpability required for the commission thereof")–and that both engaged in deliberate conduct to advance the common enterprise, i.e., the egregious neglect of the victim." *People v. Kaplan*, 76 N.Y.2d at 145. Moreover, courts in New York have held that "there is no inconsistency if the defendant acts with different mental states with regard to two different potential or intended results[,]" such as where "the defendant intentionally beats his victim but is indifferent and reckless as to whether the victim dies." *Sweet v. Bennett*, 353 F.3d 135, 145 (2d Cir. 2003) (concurring opn.) (citing *People v. Moloi*, 135 A.D.2d 576, 521 N.Y.S.2d 794, 796 (App. Div. 2d Dept. 1987)).

In *People v. Moloi*, the defendant, who had beaten the victim and thrown a pot of boiling oil at her, was convicted–as petitioner Howard has been–of two counts of first-degree assault: intending to cause serious physical injury, in violation of N.Y. Penal Law § 120.10(1) and acting with a conscious disregard for the risk of death that such conduct created, in violation of N.Y. Penal Law § 120.10(3). *Moloi*, 521 N.Y.S.2d at 795. Comparing the elements of the two first-degree assault counts, the Appellate Division found that they were consistent. *Id.* at 796. "[That] a defendant may have committed an act with the intent to seriously injure another person does not rule out the possibility that he may have also unintentionally (and recklessly) created a risk of such person's death, since not all 'serious' injuries are necessarily life threatening. Thus, it is clear that a defendant could hypothetically engage in conduct which intentionally results in serious physical injury, and unintentionally creates a grave risk of death . . . ." 521 N.Y.S.2d at 795 (internal quotations omitted); *see also Sweet*, 353 F.3d at 145 (concurring opn.); *People v.*

*Taylor*, 169 A.D.2d 743, 744, 564 N.Y.S.2d 484, 486 (App. Div. 2d Dept. 1991) ("The two counts charging depraved-mind murder and manslaughter in the first degree requiring the mental state of intentionally causing serious physical injury, involved distinct, albeit somewhat overlapping, courses of conduct occurring over several days. Although the defendant is charged with a single homicide, differing culpable mental states leading to [the victim's] death may have existed at different times over the course of those days. The defendant's intent to cause serious physical injury to the child when he repeatedly hit and stomped on his leg may be compatible with, rather than inconsistent with, the depraved indifference to human life demonstrated by his other brutal beatings and his failure to seek prompt medical attention for the child.").

### 3. Insufficiency of the proof of "grave risk of death"

The depraved indifference assault statute provides that under circumstances evincing a depraved indifference to human life, the defendant recklessly engages in conduct that creates a grave risk of death and thereby causes serious physical injury. Thus, courts in New York have explained that "two elements must be present to establish a depraved indifference assault in the first degree, [1] reckless conduct which creates a grave risk of death and [2] serious physical injury . . . ." *People v. Parrott*e, 267 A.D.2d 884, 886 (App. Div. 3d Dept. 1999). Petitioner argued on direct appeal that the prosecution failed to prove beyond a reasonable doubt that the victim was exposed to a "grave risk of death", pointing to the treating physician's concession that none of the victim's injuries appeared to be life-threatening at the time he arrived at the hospital emergency room. The Appellate Division, in upholding the conviction, did not specifically address this contention in its order. Petitioner's appellate counsel sought permission to re-argue on this, among other, bases. Re-argument was summarily denied, and the New York

Court of Appeals denied leave to appeal. Thus, it does not appear that the state courts have ruled on this particular aspect of Howard's legal-insufficiency claim. Regardless of what procedural posture this claim is in, and which standard of review is applied, I do not believe that reversal of the depraved indifference assault conviction is warranted.

At the time of petitioner's trial and conviction, the controlling New York Court of Appeals case regarding the interpretation of P.L. § 125.25(2), the depraved indifference murder statute, was *People v. Register*, 60 N.Y.2d 270 (N.Y. 1983), *cert. denied*, 466 U.S. 953 (1984), *overruled by People v. Feingold*, 7 N.Y.3d 288 (N.Y. 2006). Both P.L. § 125.25(2) and P.L. § 120.10(3) require showing that the defendant, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct that creates a grave risk of death; the difference between the two offenses is the outcome–death in the case of P.L. § 125.25(2) versus "serious physical injury in the case of P.L. § 120.10(3)."

In the case law after *Register* and prior to the shift that culminated in *Feingold*, the New York courts did not clearly define what was meant by "grave" risk of death; however, in several cases expounding upon and re-affirming *Register*, the Court of Appeals described it as a "very substantial risk of death." *People v. Roe*, 74 N.Y.2d at 25 ("[P]roof of defendant's subjective mental state is, of course, relevant to the element of recklessness, the basic element required for both manslaughter in the second degree and depraved indifference murder (*see*, [N.Y.] Penal Law § 15.05(3). Evidence of the actor's subjective mental state, however, is not pertinent to a determination of the additional element required for depraved indifference murder: whether the objective circumstances bearing on the nature of a defendant's reckless conduct are such that the conduct creates a *very substantial* risk of death.") (emphasis supplied) (citing *Register* (holding

-38-

that New York Penal Law § 125.25(2)'s requirement that the offense occur "'under circumstances evincing a depraved indifference to human life' . . . refers to neither the *mens rea* nor the *actus reus*" but rather to "the factual setting in which the risk creating conduct must occur, [which are] objective circumstances . . . .")).

The Court of Appeals distinguished reckless manslaughter from depraved indifference murder in *People v. Roe*, explaining that the jury is responsible for making a qualitative judgment as to whether the objective circumstances show that the actor behaved with a "depraved indifference to human life"–that is, with a recklessness which elevates the risk to the gravity required for a murder conviction. *People v. Roe*, 74 N.Y.2d at 25 (citations omitted). ; *People v. Poplis*, 30 N.Y.2d 85, 88 (N.Y. 1972) (finding that the defendant committed depraved indifference murder when, albeit without any intent to kill, he caused the death of a 3 ½-year-old infant as a result of continually beating the child over a period of five days; "[t]he continued brutality toward a child, found by the jury in this case, fits within the accepted understanding of the kind of recklessness involving 'a depraved indifference to human life'"); *People v. Best*, 85 N.Y.2d 826, 624 N.Y.S.2d 363 (N.Y. 1995), *aff'g*, 202 A.D.2d 1015, 609 N.Y.S.2d 478 (App. Div. 4th Dept. 1994) ("[D]efendant contests the sufficiency of the evidence to establish that she acted under circumstances evincing a depraved indifference to human life. To support that element, which refers to the wantonness of defendant's conduct, the People were required to establish that, under the circumstances, defendant's act was imminently dangerous and presented a high risk of death such that it evidenced a wanton indifference to human life or a depravity of mind (*see*, *People v. Register*, 60 N.Y.2d [at] 274-77 . . . ). We determine that the jury reasonably concluded that defendant evinced a depraved indifference to her son's life.

Defendant's repeated beatings of her sick and helpless son [causing large open wounds resulting in blood poisoning and ultimately death by asphyxiation] evinced depraved indifference and was such a wanton act as to be equivalent to intentional murder. Further, defendant's failure to seek medical attention for the boy was, under the circumstances, equally wanton.").

A rational jury could have found that the evidence compellingly established McCann and petitioner's conduct were "imminently dangerous and presented [such] a high risk of death" as to "evidence[ ] a wanton indifference to human life" and a "depravity of mind," *People v. Best*, 85 N.Y.2d 826 (citing *People v. Register*, 60 N.Y.2d at 274-77). A vast quantity of cords and cables had been used to restrain in a manner designed to be as painful and degrading as possible, with his arms outstretched above his head a "crucifix" position and his legs bound tightly with cord from knee to ankle. Extreme measures were taken to completely immobilize the underweight nine-year-old boy child victim–for instance, one of his limbs was lashed to the bedframe, which was in turn secured to the radiator attached to the wall. Because the child had been yelling, his mother stuffed a sock in his mouth, down into his throat. To ensure that the victim could not spit the sock out, petitioner used some black electrical tape he brought home to completely wrap the victim's mouth and chin. Then, as a precaution, co-defendant pulled a pillowcase over her son's head, and secured it with a sock around his neck. Thus silenced, the child was beaten further by co-defendant McCann and petitioner. For several days, he was kept naked, deprived of food and water, and told to urinate on himself. The jury could have reasonably concluded that the actions of McCann and petitioner were designed to maximize the pain inflicted and the degradation suffered by the victim.

When the police officer found Keith, he did not think the boy was alive because he was

not moving. His head jerked up reflexively when the officer felt for a pulse. The sock that had been stuffed into the boy's mouth was soaked with saliva; the first thing he asked for was a drink of water. The officer untied Keith and brought him over to the bed where he untied the cord and peeled off the electrical tape from his body, which was covered with deep cuts and marks from his head to his feet.

At the hospital, Keith was found to have numerous soft tissue injuries; a swollen lip; many lacerations all over chest, back, legs, and buttocks. His penis was swollen and had blood on the end of it. His right hand was swollen and he had crush marks on both wrists as a result of the way he was tied up. There was air under the skin on the right chest and shoulder and he had a collapsed lung, a the type of injury that would be caused by a force equal to being in a serious car crash–or a hard blow from a plastic baseball bat. Courts in New York have held that an untreated collapsed lung would create substantial risk of death within the meaning of Penal Law § 10.00(10). *See Matter of Eleda*, 280 A.D.2d 405 (App Div. 1st Dept. 2001); *People v. Thompson*, 224 A.D.2d 646 (App. Div. 2d Dept. 1996).

The victim also had numerous injuries to his muscles and his internal organs caused by blunt force or crushing trauma–his liver was filled with fluid; his duodenum was bruised; and he had blood in his urine, indicative of a kidney injury. Keith was nine-years-old but weighed only 53 pounds, which put him in the 10th percentile on children's growth charts. The doctor did concede that when the child arrived at the emergency room, none of his injuries or level of dehydration appeared to be life-threatening *at that time*. However, the doctor testified that had Keith been left unattended and not permitted to have food or water, he would have suffered hypobulimic shock, loss of consciousness, and, ultimately, death. He also testified that if the

internal injuries, such as the collapsed lung, had not worsened, the victim "probably" would have recovered. However, the proof, taken in the light most favorable to the prosecution, easily could have lead a reasonable jury to conclude that McCann and petitioner had no intention of releasing the child, much less providing him with food, water, or the most rudimentary care for his injuries. Co-defendant McCann's and petitioner's actions were calculated to ensure that Keith remained undiscovered. For instance, Keith testified that after tying him to the pole in the closet, his mother had attempted to close the closet door as much as possible, and then had taped the door to the bedroom shut from the outside. When McCann had to leave for work that afternoon, she arranged to have Tearria Overton, a teenaged girl from the neighborhood, come over to babysit. McCann told the girl's mother that she only had to watch Mikel, because Keith was not at home and was visiting his father on the other side of Buffalo. At trial, McCann admitted that this was a lie. McCann ultimately told the babysitter that Keith was tied up upstairs, but instructed her that there was no need to check on him. Keith testified that he was to be confined in the closet for five days, but was discovered by the police after only two days had expired. On these facts, the jury reasonably could have concluded that Keith was to be kept bound and gagged in the closet, starved, left to urinate on himself, and subjected to further severe beatings. It is clear from these facts that had Keith been undiscovered by the police and had remained in the custody of his mother and petitioner, his risk of death was certainly grave. It would not be unreasonable to conclude that had the course of conduct by McCann and petitioner towards Keith been allowed to continue, his death would have been inevitable.

Viewing the evidence favorably to the prosecution, in light of New York law as it existed at the relevant time, and deferring all questions as to the weight or quality of the evidence

to the jury's judgment, this Court cannot say that it was irrational to conclude that petitioner, either alone or as McCann's accessory, acted recklessly and under circumstances evincing a depraved indifference to human life, and, that his reckless conduct exposed Keith to a grave risk of death. *Cf. People v. Suarez*, 6 N.Y.3d 202, 213 (N.Y. 2005) (explaining that depraved indifference murder is "established when a defendant–acting with a conscious objective not to kill but to harm–engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim. When a defendant's actions serve to intensify or prolong a victim's suffering, they bespeak a level of cruelty that establishes the depravity mandated by statute.").

### E. Ground Five: Disproportionality of the sentence in violation of the Eighth Amendment

The Supreme Court has articulated a principle of "gross disproportionality" for measuring whether a prisoner's sentence violates the Eighth Amendment proscription against "cruel and unusual punishment." *E.g.*, *Harmelin v. Michigan*, 501 U.S. 957 (1991); *Solem v. Helm*, 463 U.S. 277 (1983); *Rummel v. Estelle*, 445 U.S. 263 (1980). Only extreme sentences that are grossly disproportionate to the crimes for which they are imposed can be said to violate the Eighth Amendment. *See id.*

On his direct appeal, petitioner contended that the sentence imposed was harsh and excessive given, among other things, that he was not the primary wrongdoer who perpetrated the abuse. As respondent argues, petitioner did not argue on appeal that the sentence imposed violated the Eighth Amendment prohibition against cruel and unusual punishment or that it otherwise violated the "gross disproportionality" principle. Since petitioner only argued that his should be reduced in the interest of justice pursuant to the Appellate Division's review powers

under state law, he did not raise the claim that his sentence was excessive in federal

constitutional terms in the state court proceedings. I therefore agree with respondent that this

claim is unexhausted. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992).

However, I also find that it should be dismissed pursuant to the authority conferred under

28 U.S.C. § 2254(b)(2) to deny petitions containing both exhausted and unexhausted claims on

the merits. To the extent that petitioner has set forth an Eighth Amendment claim, the Court

finds it lacking merit. As an initial matter, I note that the Second Circuit has held that "[n]o

federal constitutional issue is presented where . . . the sentence is within the range prescribed by

state law." *White v. Keane*, 969 F.2d at 1383. Such is true in Howard's case.

Habeas courts in this Circuit consistently have rejected petitioners' claims of both abuse

of discretion in sentencing and Eighth Amendment violations where their sentences are within

the statutory range permitted. *E.g.*, *Warren v. Conway*, No. CV-07-4117, 2008 WL 4960454, at

*30 (E.D.N.Y. Nov. 18, 2008) (citing *White*, 969 F.2d at 1383); *Alvarez v. Scully*, No. 91 CIV.

6651(PKL),1993 WL 15455, at *12 (S.D.N.Y. Jan. 11, 1993) (citing, *inter alia*, *Bellavia v.

Fogg*, 613 F.2d 369, 373-74 (2d Cir. 1979)). When reviewing sentences imposed by state courts

on habeas corpus review, federal courts "should grant substantial deference to the broad

authority that legislatures necessarily possess in determining the types and limits of punishments

for crimes, as well as to the discretion that trial courts possess in sentencing convicted

criminals." *Solem*, 463 U.S. at 290; *see also United States v. Gonzalez,* 922 F.2d 1044, 1053 (2d

Cir.1991) (finding that courts should review the disproportionality of sentences only in rare

cases because the legislature's fixing of terms for imprisonment is presumptively valid). Here,

Howard was sentenced to the maximum permissible under New York's Penal Law, as was his

girlfriend, McCann, who was the victim's mother. Petitioner argued that it was unfair for him to receive the same sentence as his co-defendant, the victim's mother, who, by any view of the evidence, was the one who initiated the monstrous, escalating acts of torture and violence against her son. However, New York's Legislature has made the decision to allow for the equal punishment of those, such as petitioner and his girlfriend, who act in concert in committing criminal acts. *See Wills v. Andrews*, 903 F. Supp. 318, 320 (N.D.N.Y. 1995) ("Legislative decisions that concern sentencing should be regarded as presumptively valid because the judiciary must assume a subordinate position on such a polycentric issue.") (citing *United States v. Gonzalez*, 922 F.2d at 1052)).

Moreover, the "gross disproportionality" principle finds sentences disproportionate to their crimes "only in the exceedingly rare and extreme case" and is reserved "for only the extraordinary case." *Lockyer v. Andrade*, 538 U.S. 63, 73-77 (2003) (internal quotation marks and citation omitted); *see also United States v. Snype*, 441 F.3d 119, 152 (2d Cir.2006) (noting that successful challenges to the proportionality of particular sentences have been exceedingly rare). Given the Supreme Court's precedent on this issue, I have no difficulty concluding that this case does not present one of those rare and extreme cases in which the Supreme Court contemplated intervention by a reviewing court into a state's sentencing decisions. Accordingly, I reject petitioner's claim that his sentence violated the Eighth Amendment.

## IV.    Conclusion

For the foregoing reasons, petitioner Quanaparker Howard's petition for a writ of habeas corpus is denied. As petitioner has not made "a substantial showing of the denial of constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     July 13, 2009
                Rochester, New York